1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WILD FISH CONSERVANCY,<br><br>                    Plaintiffs,<br><br>     v.<br><br><br>NATIONAL MARINE FISHERIES SERVICE; BARRY THOM, Regional Administrator of National Marine Fisheries Service West Coast Region; WILBUR ROSS, Secretary of Commerce,<br><br>                    Defendants. | Civil Action No. 19-0487<br><br>**COMPLAINT** |

## **INTRODUCTION**

1.    Plaintiffs Center for Biological Diversity and Wild Fish Conservancy challenge the

failure of the National Marine Fisheries Service, the West Coast Regional Administrator of the

National Marine Fisheries Service, and the Secretary of the U.S. Department of Commerce

(collectively, "Fisheries Service") to consult on the impacts of the Pacific Coast Fishery

Management Plan on critically endangered Southern Resident killer whales, also known as orcas.

2.      These iconic creatures are a cherished symbol of the Pacific Northwest's natural and cultural heritage, yet they are struggling to survive. There are only 75 Southern Resident killer whales left, including one newborn calf. The species' alarming decline in recent years means that time is running out to prevent extinction.

3.      Until a few months ago, Southern Resident killer whales had failed to successfully reproduce since 2015. Over 40 percent of newborn calves do not survive their first few years. In July 2018, a newborn calf lived for just under an hour. Her grieving mother, named Tahlequah, carried her body for 17 days over hundreds of miles.

4.      The most recent known death, which occurred in September 2018, was a three-year old Southern Resident killer whale named Scarlet who had been struggling to survive for months. She was one of the few females of reproductive age remaining in the population. Though her body has not been recovered, Fisheries Service scientists presume she is dead, and her body likely sank to the seafloor because she had become so thin and had very little blubber remaining.

5.      Researchers have been closely watching two other ailing Southern resident killer whales, Princess Angeline (a 42-year old female that is Tahlequah's mother) and Scooter (a 28-year old male). Both whales appear to be malnourished and show signs of "peanut head," where an individual has lost so much of its body fat that a depression appears behind its blowhole.

6.      In early January 2019, scientists confirmed a welcome new addition, a baby orca named Lucky, who was spotted swimming alongside its mother. Lucky is the first calf to survive past birth since 2015. Lucky and its mother are part of the L pod, the largest of the three pods (J, K, and L) that make up the Southern Resident killer whale population, each with its own distinct dialect of sounds it uses to communicate. Just this past week, the L pod was sighted in Monterey Bay, California, highlighting the expansive range of these orcas.

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

7. The primary threats to Southern Resident killer whales are starvation from lack of adequate prey (predominately Chinook salmon), vessel noise and disturbance that interferes with key foraging and other essential behaviors, and toxic contaminants that bioaccumulate in the orcas' fat. Scientists recently concluded that of these three major threats to Southern Resident killer whales, prey depletion has the biggest impact on reproductive success and survival.

8. The Pacific Coast Fishery Management Plan ("Pacific Salmon Plan") governs management of commercial and recreational salmon fisheries in federal waters off the coast of Washington, Oregon, and California from 3 to 200 nautical miles offshore. The Pacific Salmon Plan is adopted by the Pacific Fishery Management Council and approved by the Secretary of Commerce. It contains management measures and allocation provisions for Chinook, coho, and pink salmon. The Council first issued a Pacific Salmon Plan in 1977. The current version of the Pacific Salmon Plan consists of the 1984 comprehensive framework amendment of the Plan through the most recent Amendment 19, approved by the Secretary of Commerce in 2016.

9. Fisheries authorized under the Pacific Salmon Plan reduce the abundance of the Southern Resident killer whales' predominant prey by over 300,000 Chinook per year and can directly interfere with feeding behavior, which causes the orcas to forage for longer periods, to travel to alternate locations, or to abandon foraging efforts.

10. The Fisheries Service continues to rely on an outdated 2009 biological opinion to authorize salmon fisheries along the West coast under the Pacific Salmon Plan. From 2009 to present, scientists have produced significant new information about Southern Resident killer whales, the reasons for their decline from 85 animals in 2009 to just 75 today, their relationship to salmon, and the impacts of prey depletion on their survival and recovery.

11. The Fisheries Service's failure to reinitiate and complete consultation on the impacts of the Pacific Salmon Plan fisheries on Southern Resident killer whales violates the

COMPLAINT
Civil Action No. 19-0487

3

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

1   Endangered Species Act. The Fisheries Service is failing to ensure that its authorization of

2   Pacific Coast salmon fisheries under the Pacific Salmon Plan does not jeopardize the survival

3   and recovery of Southern Resident killer whales.

4          12.     Accordingly, Plaintiffs seek an order from this Court establishing a prompt

5   deadline for the Fisheries Service to reinitiate and complete consultation for Southern Resident

6   killer whales and to implement mitigation measures to benefit the orcas.

7                               **JURISDICTION AND VENUE**

8          13.     This Court has jurisdiction over this action pursuant to: 28 U.S.C. § 1331, because

9   this action arises under the laws of the United States, including the Endangered Species Act

10  (ESA), 16 U.S.C. § 1531, *et seq.* and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-

11  706; 28 U.S.C. § 1346 (action against the United States); and 28 U.S.C. § 1361 (action to compel

12  an officer of the United States to perform his or her duty). An actual, justiciable controversy now

13  exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§

14  2201-02, 5 U.S.C. §§ 701-706, and 16 U.S.C. § 1540(g).

15         14.     Venue is proper in this district under 28 U.S.C. § 1391(e). This action is brought

16  against an agency of the United States and officers of the United States acting in their official

17  capacities. Defendants maintain offices in the Western District of Washington, and the legal

18  violations are occurring in this district.

19         15.     Plaintiffs provided the Secretary of Commerce and the Regional Administrator of

20  the National Marine Fisheries Service with notice of the ESA violations more than 60 days prior

21  to the commencement of this case.

22                               **INTRADISTRICT ASSIGNMENT**

23         16.     Pursuant to Civil Local Rule 3(e), this action is properly assigned to the Seattle

24  Division of this district, because a substantial part of the events or omissions giving rise to

Plaintiffs' claims occurred in King County and Defendant National Marine Fisheries Service maintains its West Coast Regional office in King County.

## PARTIES

### Plaintiffs

17.     Plaintiff Center for Biological Diversity ("Center") is a nonprofit corporation that advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's Oceans Program focuses specifically on conserving marine wildlife and habitat. In pursuit of this mission, the Center has been actively involved in securing protections for imperiled marine mammals, including Southern Resident killer whales. In 2001, the Center filed a petition to list Southern Resident killer whales as an endangered species under the ESA, and through legal action it secured such protections for this population. The Center also has engaged in longstanding efforts to protect the habitat of Southern Resident killer whales from water and noise pollution, disturbance from vessels, the risk of offshore oil drilling activities and spills, and other threats.

18.     The Center has more than 69,543 members, many of whom live on the West Coast of the United States. The Center brings this action on behalf of itself and its members. Center members and staff live near and regularly visit the inland waters and coastal habitat of Southern Resident killer whales to observe, photograph, study, and otherwise enjoy Southern Resident killer whales and their habitat. Center members have an interest in Southern Resident killer whales and their habitat, including waters around the San Juan Islands and along the Pacific Coast. For example, Center members regularly sail, kayak, and go whale watching to enjoy the marine habitat and look for and photograph Southern Resident killer whales. Center members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from the presence of Southern Resident killer whales and their habitat. Center members and staff

COMPLAINT
Civil Action No. 19-0487                                    5

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

1    intend to continue to frequently engage in these activities and to use and enjoy Southern Resident

2    killer whales' habitat in the future.

3        19.    Plaintiff Wild Fish Conservancy is a 501(c)(3) member-based conservation

4    ecology organization incorporated in the State of Washington in 1989. Wild Fish Conservancy

5    works on a wide range of science-based projects consistent with its mission throughout the

6    Northwest from California to Alaska. Wild Fish Conservancy is dedicated to the preservation

7    and recovery of all native fish species and the marine and freshwater habitats they depend

8    on.  Wild Fish Conservancy is also committed to the preservation and recovery of the larger

9    ecosystems that play a fundamental role in the survival and evolution of wild fish, including but

10   not limited to key predators such as Southern Resident killer whales.

11       20.    Wild Fish Conservancy brings this action on behalf of itself and its

12   approximately 4,620 members. As a science-based environmental watchdog, Wild Fish

13   Conservancy actively informs the public on matters affecting wild fish in the Northwest through

14   publications, commentary to the press, and sponsorship of educational programs. Wild Fish

15   Conservancy also conducts field research and habitat restoration projects and publishes technical

16   papers. Wild Fish Conservancy has advocated, litigated, and publicly commented on federal and

17   state actions that affect the region's native fish, the habitat on which they depend, and the greater

18   ecosystem, including Southern Resident killer whales. Wild Fish Conservancy routinely seeks to

19   compel government agencies to follow the laws designed to protect native fish species and other

20   marine and freshwater species, particularly those recognized as threatened and endangered.

21       21.    Wild Fish Conservancy's members regularly spend time in areas in and around the

22   waters occupied by Southern Resident killer whales, including waters around the San Juan

23   Islands, Strait of Juan de Fuca, and along the Pacific Coast. Wild Fish Conservancy's members

24   intend to continue to visit these areas to use, enjoy, and experience Southern Resident killer

1   whales on a regular basis, including in the coming months and beyond. These members observe,

2   study, photograph, and appreciate wildlife and wildlife habitat in and around these waters. These

3   members also fish, hike, camp, boat, scuba dive, and swim in and around these waters.

4       22.   Wild Fish Conservancy's members derive scientific, educational, recreational,

5   health, conservation, spiritual, and aesthetic benefits from the inland waters and coastal habitat of

6   Southern Resident killer whales, as well as wild native fish species in those waters, and from the

7   existence of natural, wild, and healthy ecosystems.

8       23.   The Fisheries Service's failure to reinitiate and complete consultation for Southern

9   Resident killer whales using the best scientific data available fails to ensure that its actions do not

10  jeopardize the continued existence of the endangered Southern Resident killer whales and

11  deprives the species of additional protections that are vitally important to its survival and

12  eventual recovery. The Fisheries Service's failure to reinitiate and complete consultation

13  diminishes the aesthetic, recreational, spiritual, scientific, and other interests of Plaintiffs and

14  their members, because without action, Southern Resident killer whales are more vulnerable to

15  the impacts of insufficient prey availability, which also compounds their vulnerability to vessel

16  disturbance and pollution.

17      24.   The absence of an updated consultation process and biological opinion places

18  Southern Resident killer whales at greater risk of extinction and reduces their chances of survival

19  and recovery. Since the last consultation in 2009, the population has declined from 85 to 75

20  individuals, a loss of over ten percent of the population. The Plaintiffs and their members are

21  injured, because their use and enjoyment of Southern Resident killer whales and those areas

22  inhabited by the whales are threatened, degraded, and harmed by the Fisheries Service's failure

23  to ensure that its actions are not likely to jeopardize the continued existence of the endangered

24  Southern Resident killer whales.

25.     In addition, the Plaintiffs and their members are also suffering procedural and informational injuries. The Plaintiffs and their members regularly comment on agency actions with respect to fishing activities that are likely to adversely affect Southern Resident killer whales. The Fisheries Service's ongoing failure to publish a biological opinion subverts the ability of the Plaintiffs and their members to meaningfully participate in the fisheries management rulemaking process. It also deprives the Plaintiffs and their members of additional scientific and other information regarding the health of the Chinook salmon stocks most essential for the survival and recovery of Southern resident killer whales.

26.     The above-described cultural, spiritual, aesthetic, recreational, scientific, educational, procedural, and other interests of the Plaintiffs and their members have been, are being and, unless the relief requested herein is granted, will continue to be adversely affected and irreparably injured by the Fisheries Service's failure to reinitiate and complete consultation and to ensure it is not jeopardizing Southern Resident killer whales.

27.     The relief sought in this case will redress these injuries. Reinitiation and completion of consultation will ensure that the Fisheries Service considers and makes public the best available science in determining whether its actions are likely to jeopardize the continued existence of the endangered Southern Resident killer whales. Through this process, the Fisheries Service can assess the effects of the coastal fisheries on Southern Resident killer whales and develop short- and long-term approaches to improving prey abundance and availability for the orcas. This will increase the chances of Southern Resident killer whale survival and recovery, which in turn will protect Plaintiffs' and their members' enjoyment of and interests in the species and its habitat.

**Defendants**

28.     Defendant National Marine Fisheries Service is an agency within the U.S.

1  Department of Commerce. The National Marine Fisheries Service is the agency to which the

2  Secretary of Commerce has delegated the authority to manage endangered marine mammals,

3  including Southern Resident killer whales. The National Marine Fisheries Service was the

4  "Action Agency" on the 2009 Endangered Species Act Section 7(a)(2) Consultation Biological

5  Opinion on the Effects of the Pacific Coast Salmon Plan on Southern Resident Killer Whale

6  (*Orcinus orca*) Distinct Population Segment.

7      29.    Defendant Barry Thom is named in his official capacity as the West Coast

8  Regional Administrator of the National Marine Fisheries Service. Regional Administrator Thom

9  has responsibility at the regional level for implementing and fulfilling the agency's duties to

10  manage endangered marine mammals. The National Marine Fisheries Service, Northwest Region

11  conducted the Consultation on the 2009 Endangered Species Act Section 7(a)(2) Consultation

12  Biological Opinion on the Effects of the Pacific Coast Salmon Plan on the Southern Resident

13  Killer Whale (*Orcinus orca*) Distinct Population Segment. Regional Administrator Thom signed

14  and issued the 2009 Biological Opinion.

15      30.    Defendant Wilbur Ross is named in his official capacity as the Secretary of

16  Commerce. The Secretary is vested with authority over endangered marine mammals under the

17  Endangered Species Act. The Secretary has the duty and authority to conserve and recover

18  Southern Resident killer whales and is responsible for the violations alleged in this case. The

19  Secretary has the ultimate duty and authority to issue the relief requested in this complaint.

20                        **STATUTORY BACKGROUND**

21                        **The Endangered Species Act**

22      31.    When Congress enacted the Endangered Species Act (ESA), it recognized that

23  some species of fish, wildlife, and plants have been "so depleted in numbers that they are in

24  danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). It stated that "these species of

1  fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and

2  scientific value to the Nation and its people." *Id.* § 1531(a)(3).

3       32.    Congress enacted the ESA, in part, to provide a "means whereby the ecosystems

4  upon which endangered species and threatened species depend may be conserved." *Id.* § 1531(b).

5  The ESA established that it is "the policy of Congress that all Federal departments and agencies

6  shall seek to conserve endangered species and threatened species and shall utilize their

7  authorities in furtherance of the purposes of this Act." *Id.* § 1531(c)(1). The ESA defines

8  "conservation" to mean "the use of all methods and procedures which are necessary to bring any

9  endangered species or threatened species to the point at which the measures provided pursuant to

10  this Act are no longer necessary." *Id.* § 1532(3).

11       33.    The ESA protects imperiled species by listing them as "endangered" or

12  "threatened." *Id.* § 1533. A species is "endangered" if it "is in danger of extinction throughout all

13  or a significant portion of its range." *Id.* § 1532(6). The Secretary of Commerce is charged with

14  administering and enforcing the ESA for most marine species, including Southern Resident killer

15  whales, and has delegated this responsibility to the Fisheries Service. 50 C.F.R. § 402.01(b).

16       34.    Under the ESA, the Secretary of Commerce is also required to develop and

17  implement recovery plans for the conservation and survival of endangered and threatened

18  species. 16 U.S.C. § 1533(f). A recovery plan defines actions that are considered necessary to the

19  conservation and survival of a listed species.

20       35.    Section 9 of the ESA generally makes it unlawful for "any person" to "take" an

21  endangered species. *Id.* § 1538(a)(1). A "person" includes private parties as well as local, state,

22  and federal agencies. *Id.* § 1532(13). The ESA defines "take" to mean "harass, harm, pursue,

23  hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."

24  *Id.* § 1532(19). "Harm" is defined broadly by regulation as "an act which actually kills or injures

wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 222.102.

36.     Under Section 7(a)(2) of the ESA, the Fisheries Service must ensure that any action it authorizes, funds, or carries out is "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2).

37.     ESA regulations define "[j]eopardize the continued existence of" as "to engage in an action that reasonably would be expected, either directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

38.     When an agency determines that its proposed action "may affect listed species" it must engage in formal consultation for the species at issue using "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

39.     Where, as here, the Fisheries Service is both the action agency and the expert agency, it must undertake internal consultation before authorizing any fisheries that may affect Southern Resident killer whales. The consulting branch of the Fisheries Service must issue a biological opinion explaining how the proposed action will affect the ESA-listed species and determine whether jeopardy is likely to occur. *Id.* § 402.14(g)(3), (4).

40.     A jeopardy analysis requires the agency to consider the aggregate effect of past and ongoing human activities that affect the current status of the species and its habitat ("environmental baseline"); the indirect and direct effects of the proposed action, including the effects of interrelated and interdependent activities ("effects of the action"); and the effects of

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

1  future state and private activities that are reasonably certain to occur ("cumulative effects"). *Id.*

2  §§ 402.02, 402.14(g). The Fisheries Service must consider all of these factors in context of the

3  current status of the species and its habitat. *Id.* § 402.14(g).

4       41.    If jeopardy is found, the biological opinion shall suggest "reasonable and prudent

5  alternatives" to the proposed action that the Fisheries Service believes would avoid the

6  likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(h), 402.02.

7       42.    If the Fisheries Service concludes the action may take listed members of the

8  population, but the action will not jeopardize the population, the agency must produce an

9  Incidental Take Statement ("ITS") that specifies the impact of the action by setting a numeric

10  limit on take (or a surrogate if a numeric cap is impractical to establish) and identifies

11  "reasonable and prudent measures" that will minimize impacts and "terms and conditions" to

12  implement these measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i).

13       43.    The take of a listed species in compliance with the terms of a valid ITS is not

14  prohibited under Section 9 of the ESA. 16 U.S.C. §§ 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

15       44.    After consultation is completed, if a biological opinion fails to comply with the

16  ESA's standards, the action agency may not rely on it to satisfy its Section 7 duties.

17       45.    In addition, the action and consulting agencies must review the ongoing impacts of

18  the action and reinitiate consultation if the effects on species exceed or are different than

19  expected. Specifically, reinitiation is required when: (a) the amount or extent of taking specified

20  in the ITS is exceeded; (b) new information reveals effects of the action that may affect listed

21  species or critical habitat in a manner or to an extent not previously considered; (c) if the

22  identified action is subsequently modified in a manner that causes an effect to the listed species

23  or critical habitat that was not considered in the biological opinion; or (d) if a new species is

24  listed or critical habitat designated that may be affected by the identified action. 50 C.F.R.

§ 402.16.

46.     Both the action agency and the consulting agency have a duty to reinitiate consultation.

47.     The ESA specifies that Section 7 consultation must typically be completed within ninety days of its initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e). The agency's duty to ensure against jeopardy remains in effect regardless of the status of consultation.

## Administrative Procedure Act

48.     The Administrative Procedure Act (APA) governs the judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

49.     Under the APA, courts shall "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." *Id.* § 706(2)(A), (D). Agency action includes an agency's "failure to act." *Id.* § 551(13).

## **FACTUAL BACKGROUND**

### **Southern Resident Killer Whales**

50.     Southern Resident killer whales, also known as orcas, are charismatic black and white marine mammals that are an icon of the Pacific Northwest. They are intelligent, social animals that live in highly organized groups known as pods. These killer whales form strong social bonds and have been observed sharing the responsibilities of caring for the young, sick, and injured.

51.     Southern Resident killer whales are distinct from other killer whales. They are residents of the Salish Sea and have a unique dialect and diet. Their diet consists entirely of fish, primarily Chinook salmon.



**Figure 1.**      *Southern Resident killer whales (NOAA Fisheries West Coast 2015)*

52.     Southern Resident killer whales spend an average of 244 days per year in coastal waters and 122 days in inland waters according to the Fisheries Service. Each orca consumes a rough estimate of 25 salmon per day or 684,375 salmon per year for the current population of 75 individuals.

53.     The Fisheries Service listed Southern Resident killer whales as "endangered" under the ESA in 2005. 70 Fed. Reg. 69,903 (Nov. 18, 2005). The Fisheries Service designated "critical habitat" for the population in 2006. 50 C.F.R. § 226.206; 71 Fed. Reg. 69,054 (Nov. 29, 2006).

54.     Southern Resident killer whales have continued to decline since their 2005 listing as endangered. The species is now at grave risk of extinction. Four deaths since December 2016 have reduced the J, K, and L pods that make up the Southern Resident killer whale population to only 75 whales.

55.     The Fisheries Service and other scientists have identified the primary threats to Southern Resident killer whales as: (1) starvation from lack of availability of prey; (2) vessel

COMPLAINT
Civil Action No. 19-0487                                     14

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

1   noise and disturbance that interrupt key foraging and other behaviors; and (3) toxic contaminants

2   from pollution that bioaccumulate and are stored in the whales' fat. Killer whales use sound and

3   echolocation to find prey; noise pollution can mask the clicks that they use to locate prey.

4   56.   In 2008, the Fisheries Service issued a recovery plan for Southern Resident killer

5   whales. The recovery plan identified prey availability as a threat to the killer whales. The plan

6   prioritized the management of this threat through salmon restoration efforts in the region,

7   including habitat, harvest, and hatchery management considerations, and the continued use of

8   existing Fisheries Service authorities under the ESA and Magnuson-Stevens Fishery

9   Conservation and Management Act "to ensure an adequate prey base."

10   57.   The 2008 recovery plan specified that an important criteria for evaluating whether

11   recovery has been achieved will be if the Fisheries Service has sufficient knowledge of the

12   foraging ecology of Southern Residents "to determine that established fishery management

13   regimes are not likely to limit the recovery of the whales." The plan elaborates that this would

14   include "[f]isheries management programs that adequately account for predation by marine

15   mammal populations when determining harvest limits, hatchery practices, and other parameters."

16   58.   In 2014, a population viability study estimated that under status quo conditions, the

17   Southern Resident killer whales growth rate was a 0.91% annual decline, meaning it would reach

18   an expected population size of 75 by 2036. This abundance was reached in mid-2018.

19   59.   In 2015, the Fisheries Service identified Southern Resident killer whales as a

20   "Species in the Spotlight," due to its high risk of extinction. The Fisheries Service selected just

21   eight Species in the Spotlight, choosing those marine species for which "immediate, targeted

22   efforts are vital for stabilizing their populations and preventing their extinction." The Fisheries

23   Service ranked Southern Resident killer whales as a "recovery priority #1."

24   60.   Scientists have since concluded that insufficient availability of prey is a critical

COMPLAINT
Civil Action No. 19-0487                                           15

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

1  factor causing poor body condition, nutritional stress, and the decline of the Southern Resident

2  killer whales. Nutritional stress leads to fat metabolism and the subsequent release of stored

3  toxins, which can contribute to further stress and reproductive failure.

4       61.    In 2017, scientists conducted a population viability assessment that considered the

5  sub-lethal effects and cumulative impacts of contaminants, acoustic disturbance, and prey

6  abundance and tested a range of scenarios. They concluded that the effects of prey abundance on

7  fecundity and survival had the largest impact on Southern Resident killer whales' population

8  growth rate.

9       62.    A 2017 review of recent scientific research similarly concluded that prey limitation

10  is the most likely cause of poor body condition in Southern Resident killer whales.

11              **Ocean Salmon Fisheries Affect Southern Resident Killer Whales**

12       63.    Southern Resident killer whales spend almost two-thirds of the year in coastal

13  waters, mostly from early fall through spring. During this period, Southern Resident killer

14  whales' body condition tends to decline.

15       64.    Scientists have stated that coastal abundance of Chinook salmon during non-

16  summer months is likely more important for the successful survival and reproduction of

17  Southern Resident killer whales than Chinook abundance in coastal waters during the summer

18  months.

19       65.    Federally-managed Pacific Ocean salmon fisheries harvest primarily Chinook and

20  coho salmon under the framework of the Pacific Coast Salmon Fishery Management Plan

21  ("Pacific Salmon Plan").

22       66.    The federally-managed salmon fisheries catch fish from many stocks of salmon

23  along the California, Oregon, and Washington coasts that have been identified by the Fisheries

24  Service as priority prey for the critically endangered and depleted Southern Resident killer

whales. Fisheries can also directly interfere with Southern Resident killer whales feeding by producing noise and other physical disturbance.

67.     These coastal salmon fisheries are depleting the salmon stocks at a level that is biologically significant to the orcas. The Pacific Fishery Management Council reported over 250,000 Chinook caught in commercial and recreational fisheries in 2018, with an additional 65,000 Chinook mortalities reported from bycatch.

68.     One recent scientific report estimated that ocean salmon fisheries reduce Chinook abundance by 18-25 percent. A second scientific study projected that a 15 percent increase in coastal Chinook along with a reduction in noise disturbance would allow Southern Resident killer whales to reach the growth target needed for recovery.

**The Fisheries Service Continues to Rely on an Outdated 2009 Biological Opinion for Southern Resident Killer Whales**

69.      After the Fisheries Service listed Southern Resident killer whales as endangered under the ESA in 2005, it completed three consecutive annual consultations to evaluate the effects of the Pacific Salmon Plan fisheries on the orcas.

70.     In 2009, the Fisheries Service completed a long-term biological opinion for the Pacific Salmon Plan and Southern Resident killer whales ("2009 Biological Opinion") that the Fisheries Service stated would remain effective "until reinitiation is deemed necessary."

71.     In the 2009 Biological Opinion, the Fisheries Service stated that "any Federal action that is likely to hinder the reproductive success or increase the risk of mortality of a single individual is likely to appreciably reduce the survival and recovery of the DPS" and the Fisheries Service must therefore "scrutinize even small effects on the fitness of individuals that increase the risk of mortality or decrease the chances of successful reproduction."

72.     The 2009 Biological Opinion stated that it was unknown whether lack of prey was

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

limiting the ability of Southern Resident killer whales to survive and recover. It concluded that while the annual ocean salmon fisheries could result in some level of harm to all Southern Resident killer whales by reducing prey and thus causing animals to forage for longer periods, travel to alternate locations, or abandon foraging efforts, the fisheries were not likely to jeopardize the continued existence of Southern Resident killer whales or adversely modify their critical habitat.

73.    The 2009 Biological Opinion did not place any numerical or other surrogate value on the extent of Southern Resident killer whale take authorized, which would have served as a trigger for reinitiation based on exceeded take. Instead, the Fisheries Service restated the regulatory requirement that it would reinitiate consultation if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the identified action is subsequently modified in a manner that causes an effect to listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the identified action.

74.    The Fisheries Service has not issued a biological opinion on the impacts of the Pacific Coast salmon fisheries on Southern Resident killer whales since 2009 when the population stood at 85 individuals. The population has declined from 85 animals in 2009 to 75 animals today.

75.    The Fisheries Service continues to rely on the 2009 Biological Opinion to authorize the annual Pacific salmon fisheries.

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

76.     The Fisheries Service retains discretionary involvement and control over Pacific salmon fisheries. This discretion can be used for the benefit of Southern Resident killer whales.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violation of the ESA – Failure to Reinitiate and Complete Consultation

77.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

78.     The Fisheries Service has failed to reinitiate and complete consultation on the impacts of its authorization of Pacific Coast salmon fisheries under the Pacific Salmon Plan on Southern Resident killer whales. This violates Section 7 of the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(e), 402.16.

79.     The Fisheries Service's failure to reinitiate and complete consultation on the impacts of its authorization of Pacific Coast salmon fisheries under the Pacific Salmon Plan on Southern Resident killer whales constitutes arbitrary and capricious agency action, agency action "unlawfully withheld or unreasonably delayed," and/or agency action made "without observance of procedure required by law" under the APA. 5 U.S.C. §§ 706(1), 706(2)(A), (D).

### Second Claim for Relief
### Violation of the ESA – Failure to Ensure Against Jeopardy

80.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

81.     By continuing to rely on an outdated Biological Opinion from 2009, the Fisheries Service is failing to ensure that its authorization of Pacific Coast salmon fisheries under the Pacific Salmon Plan is not likely to jeopardize the continued existence of Southern Resident killer whales. This violates Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

1

## **REQUEST FOR RELIEF**

2    For the reasons stated above, Plaintiffs respectfully request that this Court:

3        1.        Declare that the Fisheries Service has violated and continues to violate Section 7

4    of the ESA and its implementing regulations by failing to reinitiate and complete consultation on

5    the impact of its authorization of fisheries under the Pacific Salmon Plan on Southern Resident

6    killer whales;

7        2.        Declare that the Fisheries Service has violated and continues to violate Section

8    7(a)(2) of the ESA by failing to ensure that its authorization of fisheries under the Pacific Salmon

9    Plan does not jeopardize the continued existence of Southern Resident killer whales;

10       3.        Declare that the Fisheries Service has violated and continues to violate the APA

11   by failing to reinitiate and complete consultation on the impact of its authorization of fisheries

12   under the Pacific Salmon Plan on Southern Resident killer whales;

13       4.        Order the Fisheries Service to reinitiate consultation within 30 days;

14       5.        Order the Fisheries Service to complete consultation within 90 days of

15   reinitiation;

16       6.        Order the Fisheries Service to implement additional mitigation measures to reduce

17   the risk of insufficient prey abundance and availability for Southern Resident killer whales;

18       7.        Award Plaintiffs the costs of this litigation, including reasonable attorneys' fees;

19   and

20       8.        Grant such other relief as may be just and proper.

21

22

23

24

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146
Seattle, WA 98117
(206) 327-2344

1    Respectfully submitted this 3rd day of April 2019

2
3                                /s/ Sarah Uhlemann
                                 Sarah Uhlemann (WA Bar No. 41164)
                                 Sophia Ressler (WA Bar No. 48406)
4                                CENTER FOR BIOLOGICAL DIVERSITY
                                 2400 NW 80th Street, #146
5                                Seattle, WA 98117
                                 Phone: (206) 327-2344
6                                suhlemann@biologicaldiversity.org
                                 sressler@biologicaldiversity.org
7
                                 Julie Teel Simmonds (CO Bar No. 32822)
8                                CENTER FOR BIOLOGICAL DIVERSITY
                                 1536 Wynkoop St., Ste. 421
9                                Denver, CO 80202
                                 Phone: (619) 990-2999
10                               jteelsimmonds@biologicaldiversity.org
                                 *Pro hac vice pending*
11
                                 Catherine Kilduff (VA Bar No. 89727)
12                               CENTER FOR BIOLOGICAL DIVERSITY
                                 801 Boush St., Ste. 200
13                               Norfolk, VA 23510
                                 ckilduff@biologicaldiversity.org
14                               *Pro hac vice pending*

15                               *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24